**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| THOMAS MAZUR, | ) |
| | ) |
| | ) CIVIL ACTION NO. 06-01045 |
| Plaintiff, | ) |
| | ) |
| v. | ) Chief Judge Donetta W. Ambrose |
| | ) Magistrate Judge Caiazza |
| | ) |
| HARTFORD LIFE AND ACCIDENT | ) |
| COMPANY, | ) |
| | ) |
| | ) |
| Defendant. | ) |

### REPORT AND RECOMMENDATION

#### I. RECOMMENDATION

Thomas Mazur ("Mazur" or "the Plaintiff") filed this action
pursuant to the Employee Retirement Income Security Act ("ERISA"
or "the Act") 29 U.S.C. §§ 1001 et seq., alleging that in 2005
Hartford Life and Accident Insurance Co.("Hartford" or "the
administrator") wrongfully terminated long-term disability
("LTS") benefits which he had received since 2000 under the terms
of an employer-sponsored plan ("the Plan") governed by ERISA.
Mazur also alleged that in terminating his disability benefits,
Hartford breached fiduciary duties imposed by Section 1104 of the
Act. Cross Motions for Summary Judgment (Docs. 16 and 19) are
pending. It is respectfully recommended that the Motion for
Summary Judgment filed by Hartford (Doc. 16) be granted, and that
the Motion for Summary Judgment filed by Mazur (Doc. 19) be
denied.

## II. **REPORT**

### A. **BACKGROUND**

Mazur served as Assistant Director of Human Resources at Latrobe Area Hospital from November 1982 to December 7, 2000, when he became disabled due to lower back pain. During his tenure at Latrobe, Mazur participated in a long term disability insurance plan underwritten and administered by Hartford. The record shows that Mazur first sought medical care for back pain in the spring of 2000. In May, he consulted phsysiatrist, Dr. Rich Kozakiewicz, who stated that he had reviewed the results of an MRI showing "a small right and central protrusion at L5-S1" and "a small protrusion at L4-5 to the right nearing the . . . nerve root." (R. 706). Tests were positive for lower back and right leg pain. Reflexes were diminished on the right and there was decreased sensitivity to touch in the right L5 dermatone. (R. 707). Dr. Kozakiewicz recommended that Mazur stay "off work for now".

Mazur saw Dr. Kozakiewicz on June 9, 2000. He complained of constant low back pain, but noticed improvement in the right leg symptoms. He was told again that he should be "[o]ff work for now." (R. 704). Following Mazur's visit later the same month, Dr. Kozakiewicz noted that the right L5 radiculopathy was "beginning

2

to improve." (R. 702).

On July 3, 2000, Mazur continued to report low back and right leg pain, particularly when sitting. The right L5 radiculopathy was "continuing to improve." (R. 700). Mazur was scheduled to have an epidural steroid injection. With respect to work, the doctor wrote: "Off work for now. Mr. Mazur's presentation continues to medically support this recommendation." (R. 701).

The epidural "afforded [Mazur] some improvement." (R. 698). His overall condition continued to improve slowly. Although Mazur was instructed not to return to work, Dr. Kozakiewicz "hope[d] to transition Mr. Mazur back to his full work duties in the near future." (R. 699). On July 28, 2000, the doctor recommended a second steroid injection and approved Mazur's return to "full work duties without restrictions as of [July 31]." Id.

On August 8, 2000, Dr. Kozakiewicz reported that Mazur's back and leg pain were worse after he was required to sit in meetings for prolonged periods. Mazur continued to work.(R. 694). An EMG study was normal, with no evidence of nerve root injury. (R. 692-93, 690). In late August, Dr. Kozakiewicz reported that Mazur described improvement, but continued to suffer from "mild persistent low back pain with intermittent right lower limb . . . symptoms . . . ."(R. 690). Mazur continued full work duty.

On September 15, 2000, Mazur stated that his back pain had

increased significantly. He was scheduled for a third epidural injection, and continued to work. (R. 688).

Mazur did not see Dr. Kozakiewicz again until mid-December 2000. Despite the period of time in which he had done "rather well", Mazur suffered from recurrent lower back and right leg pain. (R. 688). It was difficult for him to sit. The doctor wrote: "Off work for now. Mr. Mazur's presentation supports this." (R. 687). In early January, Dr. Kozakiewicz scheduled a lumbar CT myelogram, and directed that Mazur remain home from work.(R. 684).

Dr. Kozakiewicz summarized the results of the myelogram:

> The previously clinically relevant L4-5
> disc looked quite good. There was a
> persistent central and right protrusion
> at L5-S1. ( I note that this was present
> on the MRI of 5/00 but Mr. Mazur's symptoms
> and exam through the bulk of his presentation
> have not suggested [that it] had been
> previously clinically relevant.)

(R. 682). While he noted that Mazur's L5 nerve root irritation had "significantly improved," it was necessary "to move forward aggressively with conservative care directed at the L5-S1 disc level." Id. Another epidural injection was scheduled, and Mazur was directed not to return to work.

Mazur reported some improvement at his February 2, 2001 visit, but continued to suffer persistent low back pain and right limb symptoms. The treatment regimen was unchanged, with Mazur remaining off work. On February 15, he had an epidural. (R. 677).

Later in the month, Dr. Kozakiewicz summarized Mazur's problem as an "[i]ncreasingly symptomatic right L5-S1 disc protrusion with accompanying right S1 nerve root irritation." (R. 678). Mazur was referred for a neurosurgical evaluation.

Mazur was examined by neurosurgeon, Dr. Daniel Muccio, in March 2001. Dr. Muccio recorded his impression, in pertinent part, as follows:

> Mr. Mazur presents with the signs and symptoms of right S1 radiculopathy. His myelogram reveals decreased filling of the right S1 nerve root due to a disc protrusion. I therefore offered surgical intervention . . . We discussed the risks of surgery . . . We discussed the alternatives to surgery including continued care. We briefly discussed chiropractic care. I told him that I did not feel that it would provide him with long-lasting relief, but it was not completely contraindicated either . . . He plans to discuss things with Dr. Kozakiewicz further.

(R. 657).

On March 10, 2001, Mazur applied to Hartford claiming entitlement to LTD benefits based on the disabling effects of the disc protrusion and nerve root irritation. In his application, Mazur stated that he was unable "to maintain an upright seated position due to pain in [his] back and legs, and episodic loss of feeling in his right leg." The sensory deficit also made it difficult for him to walk.(R. 666).

Dr. Kozakiewicz examined Mazur on March 29, 2001, noting

5

that Mazur "is significantly limited in his ADLs. He also has significant difficulty with sitting for any length of time (this is consistent with discogenic pathology, noting that the seated position increases intradiscal pressure)." (R. 648). The doctor strongly recommended that Mazur have surgery and wrote that Mazur's presentation again supported an off work recommendation. (R. 649).

On April 3, 2001, Dr Kozakiewicz completed a Physician's Statement of Continued Disability. He stated that Mazur could stand between one-third and two-thirds of a day, walk one-third of the day, but could not sit for more than twenty minutes at a time. He could lift, push, and pull ten pounds frequently, twenty pounds occasionally, and could drive for less than twenty minutes at a time. (R. 647).

In a letter dated April 9, 2001, Hartford informed Mazur that his application for LTD benefits had been approved. (R. 639). He was told that his benefits would continue, subject to the terms and limitations of the policy, as long as he met the policy definition of "total disability." During the elimination period and for the next two years, he would be deemed totally disabled if he could not perform all of the material and substantial duties of his occupation. Id. Mazur was also told that as of March 8, 2003, he would be deemed totally disabled as long as his disability kept him from doing any occupation or work

for which he was or could become qualified by: 1) training; 2) education; or 3) experience. In any event, he would not be entitled to benefits after August 8, 2014. (R. 640). Mazur was directed to apply for Social Security disability benefits.

Mazur's application for Social Security disability benefits was denied initially on June 19, 2001. In the same month. Mazur began seeing chiropractor, Dr. Frazetta, two times per week. Mazur consistently complained of pain in his lower back and right leg. (R. 628, 627, 626, 625). In August 2001, Dr. Frazetta noted an "overall 60-70 per cent improvement" in Mazur's symptoms. (R. 624). Mazur was able to begin walking on a treadmill. Id. On August 20, 2001, the doctor noted that Mazur planned a trip to Maui, Hawaii. Id. At his first visit to Frazetta following the trip, Mazur reported that he had done "pretty well while away" although he had some bouts of leg and calf pain. (R. 623).

In a Statement of Continued Disability prepared in September 2001, Dr. Frazetta diagnosed sciatica and segmental dysfunction in the lumbar area. The pain in Mazur's right leg had improved, although he still suffered mild to moderate back pain. (R.620). He could not stand in one place for more than fifteen minutes, nor sit longer than thirty minutes at a time. He could lift and carry ten to fifteen pounds, and had limited ability to reach over his head. He could drive for no longer than thirty minutes and could use the keyboard for about fifteen minutes at a time.

(R. 621). Mazur was encouraged to walk for as long as he could.
Dr. Frazetta predicted that the limitations noted would last for
up to one year from the date of the initial treatment. Id.

Dr. Frazetta completed a Physical Capacities Evaluation Form
in December 2001. He stated that Mazur could sit four hours in an
eight hour day in thirty minute increments, stand for fifteen
minute periods to a total of four hours, walk to toleration, and
could drive for four hours with breaks every half hour. (R. 613).
He was capable of lifting one to ten pounds "constantly", and
eleven to twenty pounds "frequently", but could never lift items
weighing more than twenty pounds. He could never climb or
balance, but could stoop, kneel, crouch, crawl, and reach above
his shoulder occasionally. Id. He could reach at waist level
frequently, but could never reach below his waist. Dr. Frazetta
summarized his findings as follows:

> In the past 8 months Tom has improved, he is
> more functional than he was before chiropractic.
> His recovery time is improved as well. He will
> still get a lot of stiffness when standing too
> long (10-15 min) or sitting. Bending at times
> will send pain down his leg but less frequent.

(R. 610). Dr. Frazetta did not know whether Mazur's condition was
permanent, and did not know whether he was capable of resuming
his regular occupation. "I would like to see more improvement
before patient goes back to light duty. I feel patient may
relapse if brought back too soon." (R. 610).

In April 2002 Dr. Frazetta reached essentially the same

8

conclusions about Mazur's work capacity. He wrote: "Overall improved since beginning, but unchanged in past 3 months." (R. 33).

Relying on the improvement noted, and on Mazur's age and professional background, Hartford referred Mazur's claim to its Rehabilitation Division. Personnel in that division discussed with Mazur steps he might take to return to work, and offered the services of Sinsabaugh Consulting Services, P.C., a firm specializing in disability management and returning employees to work. (R. 568 70). Talks with Sinsabaugh were unproductive.

In August 2002, Mazur was awarded Social Security benefits, with an onset date of December 2, 2000; he was awarded benefits effective June 1, 2001. (R. 523).

In September 2002, Dr. Frazetta completed a Physical Capacities Evaluation Form noting that Mazur's condition and work-related capacity were improved in general, but had not changed from the date of the last evaluation. (R. 17). In the same month, Mazur reported to Hartford that he continued to experience difficulty sitting, standing, and walking for longer than thirty minutes. His ability to function varied with the day. He was able to shower, walk, feed the dog, prepare meals, spend time on the computer, read, nap, and do floor exercises. Id.

In December 2002, Hartford notified Mazur that his application for benefits had been approved under the Any

Occupation test, meaning that he would continue to receive benefits when the change in the plan definition of "disability" became effective on March 8, 2003. (R. 16, 64).

In January 2003, Hartford wrote to Mazur offering to settle his disability claim for a lump sum of $83,279.27. This sum included forgiveness of an overpayment that Mazur owed to Hartford resulting from overlappping benefits awarded by SSA. (R.65). Hartford had set aside a net reserve of $116,606 for Mazur's claim. (R. 457). Mazur rejected the offer in February 2003. (R. 16).

In October 2003, Mazur reported to Hartford that he was unable to sit or stand for longer than ten or twenty minutes, and needed to change position frequently. His condition limited his ability to perform sedentary work and to drive. (R. 14). He reported that some days he was "completely dormant." Otherwise, he was able to perform stretching exercises while still in bed. He could shower, feed the pets, make breakfast, walk the dog, do light chores, go to the market, read, watch television, spend time on the computer, and do floor exercises as tolerated. He required assistance getting dressed in that he needed to lie down to put on socks and wear slip-on shoes. Id.

In February 2004, Mazur contacted Hartford and requested a second settlement offer. Hartford responded two days later, offering to settle for $73,5000 - an amount already reduced by

10

the amount of Mazur's outstanding overpayment obligation. (R. 14). Hartford's reserve for this claim was $126,302. (R. 447). On March 15, 2004, he rejected the offer, electing to continue receiving monthly benefits. (R. 14).

In November 2004, Mazur submitted a Claimant Questionnaire to Hartford. (R. 431). He stated that he was able to drive for a maximum of twenty to thirty minutes, but that pain in his leg forced him to drive in a somewhat reclined position. According to Mazur, he could walk, sit and stand for about the same length of time. Some days, he was unable to do any of these things. Id. Typically, he could sit or stand for only ten to twenty minutes, and had to change position frequently. He reported that he was no longer able to enjoy hobbies or social activities, and that he had only occasional interaction with close friends, mostly in his home. Some days, he was completely incapacitated by pain, stiffness, and numbness. Other days he was able to do stretching exercises, prepare meals, shower, fold linen, empty the dishwasher, pay bills, get the mail, go to the corner market to get milk, read newspapers, administer ice therapy, and take his medication. Id.

Also in November 2004, Hartford received a Statement of Continued Disability from Dr. Frazetta. (R. 438). Dr. Frazetta stated that Mazur could not stand in one place for more than fifteen to twenty minutes, could walk to tolerance, sit for

thirty minutes, and was limited in his ability to reach overhead, push, and pull. (R. 794).

In January 2005, Hartford investigator, Gary Harrison, initiated a proactive review of Mazur's file. Harrison wrote:

> Claimant has been our of work since 12/2000
> for bulging disc. Neurosurgical recommendation
> at the time was to intervene surgically.
> Claimant opted not to have surgery and since has
> received chiropractic care. There is no indication
> of residual neurological deficits or limitations.
> The clinical information does not appear to be
> consistent with long-term total disability.
>
> 1/27/05 . . . [C]laimant has seen only the
> chiropractor for the past 2-3 years. He reports
> a very dormant lifestyle centered primarily
> around his home. Although there are findings on
> MRI in his back, they do not seem to be of the
> extent that would cause him to stop all
> previous activities and hobbies and discontinue
> visiting friends.

(R. 179). Hartford requested that surveillance be done.

Surveillance was conducted on February 11 and 12, 2005. About four minutes of Mazur's activity were videotaped on February 11. (Disc 1). During this time, Mazur is shown bending to pat his dog, walking the dog, lying down to look under his car, standing from this lying position, taking four plastic grocery-sized bags from his car, kicking the car door closed with his right leg while facing away from the car, carrying the bags up the stairs to his house, and walking up a small hill on the side of his house while carrying something. The four minutes of videotape shot on February 12, 2005 show Mazur transferring items

12

from a shopping cart in a parking lot to the trunk of his car. Some of these items were bags, others look to be full boxes. Mazur made at least five transfers, from both the basket of the cart and the area underneath. Id.

About forty minutes of videotape were shot on March 15, 2005. (Disc 2). That tape shows Mazur carrying a propane tank and placing it in his van. He takes his dog for a walk in a cemetery and is seen bending repeatedly, and jogging. He drives the van, making multiple stops. At one point, he and a woman stop the van and Mazur opens the trunk. The two remove a large piece of furniture from the van. Mazur reaches over his head multiple times to place a wedge in the door through which they carry the furniture. Mazur and the woman emerge from the building carrying a large couch which Mazur spends several minutes adjusting in the back of the van. Next, he alone carries and maneuvers a large armchair out of the door of the building, places it in the back of the van, and again arranges the item until he is able to pull down the rear door. He and the woman then drive to Goodwill where the furniture is unloaded. Mazur then pumps gas into his van, and makes a stop at New Ken Generator Service.

A third disc contains about eleven additional minutes of videotape from March 15. Mazur, at the same location where he loaded and unloaded the furniture, is assisted by a woman in carrying what appear to be two large Styrofoam boxes to the back

13

of his van. (Disc. 3). Again he reaches overhead a number of times to secure the building door. He then crawls into the back of the van and spends a number of minutes there until he crawls out again with the boxes - which appear to be much lighter - and takes them to a dumpster. He opens the lid of the dumpster, reaching upward, and tosses the boxes in. Back in front of his house, he exits the front of the van, pushing the door closed in a backward twisting motion with his right leg. He then walks around the van to the side door, opens it, removes what appears to be a filled tank of propane, and carries it to the steps of his house.

Disc three also contains about ten additional minutes of video recorded on March 16, 2005. After leaving with his wife in the car, Mazur returned home, and left again, this time heading to the Holy Smoke cigar and cigarette store. He entered the shop at about 11:00 a.m., and was videotaped sitting on a stool behind the counter with legs crossed, leaning against the wall. Mazur exited the shop some four hours later, and returned to his house with his wife. He moved two empty trash cans a short distance into his driveway, maneuvering one into an upright position with his right leg lifted. He later left the house again with his wife to run errands, getting out of his car twice. He drove to the building from which he had taken the couches, got out of the car, and went in. He then drove home.

14

On May 12, Hartford investigator Harrison met with Mazur to discuss his level of functioning in light of the surveillance tapes. Mazur was interviewed prior to being shown the surveillance tape. During the interview, Mazur behaved differently than he had in the videos. He walked with a noticeable limp, showing signs of discomfort physically and verbally. He shifted his position often, and seemed to have a limited range of motion. He did not sit straight on the sofa, but got up and down in one motion from a seated position four times. He pushed himself from a seated position once, knelt on the floor before sitting on the side of the sofa, and placed an ice pack on his lower middle back twice during the interview. (R. 182).

Mazur answered questions regarding his ability to engage in various activities. He stated that he was able to walk for a maximum of ten minutes before experiencing increased lower back and right leg pain. The pain could be bad, moving to his right foot. He described his gait as slow and methodical. (R. 186). He was able to do light grocery shopping, and clothes shopping if he did not try them on. He was able to shop for a maximum of ten to twenty minutes leaning on a shopping cart for support. If he exceeded these time limits, his pain increased to the point where he needed to lie down, apply ice, and take medication.

His ability to stand was limited to a maximum of five to ten minutes, and he could carry items weighing a maximum of five

pounds. "There's nothing I have to lift anymore, I'm really dormant. I don't know what I would experience if I exceeded this weight because I have never tried it. An example of something that I can carry without being uncomfortable is a 5 pound bag of sugar, to fill up the sugar bowl." Id. He could bend at twenty degrees for a few seconds only, could twist at the waist slightly, and could not squat. He could kneel only if he rose with support. He could push and pull light items, but usually used his left hand when opening the glass doors at a business or taking a chair from under a table. He was cautious about reaching above his shoulder. (R. 187). To use stairs, he needed the support of a railing. He had full use of his hands and fingers, and could typically concentrate without difficulty or restriction. Id. Pain made it difficult for him to sleep and stay asleep. He usually napped during the day. Id.

He could drive for about twenty minutes without having tingling and loss of feeling in his right foot. He had to assume a reclining position with "very little bend at the elbow when grasping the wheel." (R. 188). He had to lift his leg with his hands to get it in the car. He stated: "When getting in I stand against the side of my vehicle, put my buttock onto the seat and swing my legs in. When getting out, I always use the grab bars for support." Id. He had lost forty-five pounds as of the date of his disability. He could not do outside activities except

16

dragging the garbage can to the curb if it was light. He could perform activities that did not require much stooping or bending. Id.

He rated his pain level that day at a seven, stating that on his best days it was a four and on bad days was ten. He averaged two or three good days per week, and two bad days. The most he could manage on a bad day was riding with his wife, driving to visit friends about twenty miles away. He stated that "[d]uring the past 6 months, [he had] not experienced a time when he could exceed the level of functionality or be more active than he [had] described." (R. 189). Mazur reported that since his disability he had not been involved in recreational activities, hobbies, or travel. He could not return to work because of his inability to transport himself, his "tolerance to sit, stand, and walk (necessary activities) and fatigue." (R. 190).

Mazur was then shown the videos. When asked if he wanted to revise the summary of his capabilities, Mazur indicated that he would speak with his attorney.(R. 183).

Om May 13, 2005, Investigator Harrison noted that Mazur's "demonstrated tolerances are highly inconsistent with his reported limitations." (R. 180). The matter was referred to Hartford's home office for further review. Later in May 2005, Hartford wrote to Mazur's treatment providers asking for current copies of his medical records. (R. 74, 75). On July 26, 2005, Dr.

17

Frazetta wrote:

> After reviewing the evidence I agree that Mr.
> Mazur, at some capacity, can perform full-time
> sedentary light to medium work, but maybe not
> every day. He indicated that he averages 2 bad
> days/week. If these days happen to fall on a
> work day he will have a difficult time
> functioning. This is my opinion which is based
> on what Mazur said in the report and treating
> [him] over the years . . . .

(R. 380).

Hartford also sought an independent medical review of
Mazur's records from Todd Lyon, M.D., a family practitioner with
the Medical Advisory Group, LLC, in Plaistow, New Hampshire. In a
report dated August 15, 2005, Dr. Lyon wrote that he had reviewed
the contents of Mazur's medical records, including notes from
Drs. Frazetta, Kozakiewicz, Muccio, and Nikowla  -Kozakiewicz's
associate who treated Mazur four times from 2/21/01 through 5/
29/03 for poison ivy, complaints of low back pain, sinusitis, and
a possible kidney stone. (R. 382-84). He had also seen the
surveillance video and report, the records of Harrison's
interview with Mazur, and CT/myelogram and EMG nerve studies. (R.
370).

Dr. Lyon discussed these records giving particular attention
to the physical findings. He wrote: "In the earlier records from
2000 and 2001 there is evidence of intermittent radiculopathic
symptoms and focal sensory loss in the lower right extremity. In
the later records, neurological exams are normal." (R.371). He

reemphasized this point later in the report:

> [I]n 2000 and 2001, there appears to be
> some evidence that Mr. Mazur had
> radiculopathic complaints, and possible
> S1 nerve root irritation, but no true
> lumbar radiculopathy. His physical exam
> findings did occasionally show some minor
> sensory abnormality of the right lower
> extremity, but he has never had documented
> motor weakness of that limb . . . [T]he
> medical records indicate that Mr. Mazur's
> physical exam findings were entirely normal
> with a normal gait and stance and no
> sensory abnormalities.

(R. 375).

Dr. Lyon also addressed and summarized the video evidence:

> [T]he video surveillance material shows
> Mr. Mazur engaged in moderately rigorous
> activity on multiple days in February and
> March of 2005 . . . [M]azur is capable of
> forward bending and lifting and carrying
> at far greater capacity than what he
> reported to Mr. Harrison during his
> claimant interview on 5/12/05. It appears
> . . . that Mr. Mazur has the capacity
> for at least 20 pounds of lifting and
> carrying and for repetitive stooping,
> bending, and twisting at the waist. His
> gait appeared unrestricted and he was
> capable of independent driving,
> manipulating car keys and operating a
> computer.

(R. 374-75). He concluded his report with the following:

> "[N]o specific restrictions or limitations
> are indicated at this time . . . I feel that
> it is reasonable to allow him . . . the
> freedom to adjust positions periodically . . .
> [N]o other specific restrictions or
> limitations are indicated based on the
> evidence reviewed.

(R. 377).

On August 22, 2005, Hartford compiled an employability analysis establishing that Mazur could perform his former sedentary work. There were at least five other positions that were deemed "appropriate and commensurate to wage." (R. 347 - 366).

Following receipt of this report, Hartford wrote to Mazur on August 31, 2005, notifying him that his LTD Benefits would end as of September 1, 2005. (R. 81). The reasons underlying termination were fully explained, as was Mazur's right to appeal the decision. Mazur was promised access to all relevant information, and was told that he could submit additional comments, documents, records and other information pertaining to the claim. He was also notified that if Hartford denied the claim a second time, he had the right to bring a civil action pursuant to Section 502(a) of ERISA.

On February 25, 2006, Mazur, through his attorneys, wrote to Hartford notifying them that he intended to appeal the denial of benefits. (R. 247). Included with the letter was Mazur's statement outlining his ongoing difficulties, (R. 248), and a Physical Capacity Evaluation Form prepared by Mark Gottron, D.O., who was identified as Mazur's primary care physician. (R. 249-251).

Dr. Gottron wrote that Mazur suffered from lumbar degenerative disc disease with neuropathy which caused severe

pain, range of motion difficulties, and a need for multiple position changes. He could stand, walk, or sit up to ten minutes in an eight hour day. In a normal workday, Mazur would be required to lie down for four hours, and was unable to sit, stand, or alternate sitting and standing for even one hour. (R. 249). He could lift no more than five pounds, and could only perform simple grasping, pushing, pulling, and manipulation. He could use his feet to operate foot controls. Occasionally, he could bend, climb, stoop, balance, crouch, kneel, crawl, reach, push, and pull, but not without pain. (R. 250).

Mazur's condition required that he avoid cold, poor ventilation, fumes, odors, gas, moving machinery, smoke, hot air temperatures, wetness, vibrations, humidity, and heavy lifting. Ignoring these restrictions would cause severe pain, decreased concentration, and fatigue. (R. 250). When asked to identify the objective medical findings underlying his conclusions, Dr. Gottron referred to an MRI, an orthopaedic surgeon's evaluation - neither of which was contained in the administrative record - and his prescriptions for pain management. In the Comments section of the report, he wrote: "NO WORK". (R. 251).

In response to Mazur's appeal, Hartford secured the services of a second independent medical reviewer, Robert Pick, M.D., a board certified orthopedic surgeon affiliated with the University Disability Consortium, giving him access to the Hartford file,

the Dempsey Investigations file, and the medical records of Doctors Gottron, Nikould, Lyon, Frazetta, Kozakiewicz, and Muccio. He summarized these records and noted that he had spoken by phone with Dr. Gottron. Dr. Gottron had seen Mazur three weeks prior to the conversation, and had diagnosed "an orthopedic problem." He stated that Mazur "is on narcotic medications. He has diminished range of motion."( R. 137). When Pick asked Gottron whether Mazur could engage in sedentary activities, Gottron replied: "I don't see why not." Pick then asked if Mazur could work an eight hour day. Gottron answered that he "should start 4-6 hours a day and see how he does." Id.[1]

Dr. Pick also spoke with Dr Frazetta, who essentially reiterated the information set out in his written report, but added: "[S]peak with another doctor about his limitations, I do not know if he can do a full day off the bat." He also said: "I do not know if he can work a full day, he has good days and bad days."(R. 138)

Dr. Pick noted that the record did not contain substantive objective findings on examination by multiple physicians. The 8/22/00 EMG report was negative and the "1/16/01 myelogram and post myelogram CT scan report [do] not indicate any clinically

---

[1]In a written confirmation of his conversation with Dr. Pick, Dr. Gottron amended his response to indicate that he did not have Mazur's chart in from of him during the telephone conversation. He characterized the pain Mazur suffered with reduced range of motion as "severe". ( R. 144).

significant findings. Although describing limited filling of the right S1 nerve root, the report indicated that the nerve root does fill out with contrast on other views." (R. 138-39). Dr. Pick concluded:

> Based on my review of the records provided, review of the surveillance videos and conversations with the physicians of record, it is my considered medical opinion to a reasonable degree of medical certainty that Mr. Mazur has work capacity in at least the light category [of] work activities on a full-time basis. He probably has the ability to engage in most, if not all medium-level work activities as well. This is on an ongoing basis as of 9/1/05 and continuing . . . .

(R. 139).

On April 18, 2006, Hartford denied Mazur's appeal, confirming the cessation of benefits. (R. 127). This action followed.

## B. **DETERMINING THE STANDARD OF REVIEW**

The parties agree that the applicable standard of review is governed by the decision of the Third Circuit Court of Appeals in Pinto v. Reliance Standard Life Insurance Co., 214 F.3d 377 (3d Cir. 2000).[2] There, the Court held that "when an insurance

---

[2]In his Motion for Summary Judgment, Mazur contends that the court should apply a de novo standard of review. He recognizes, however, that the case law establishes that the do novo standard is inapplicable where the Plan gives the administrator discretion to determine whether a claimant is eligible for benefits or to construe the terms of the Plan. Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989). Although the parties disagree over which document controls the calculation and termination of benefits, both contain clauses committing to Hartford full discretion and authority to determine eligibility for benefits and to construe and interpret all

23

company both funds and administers benefits it is generally acting under a conflict that warrants a heightened form of the arbitrary and capricious standard of review." Id. at 378. "[T]he abuse of discretion or arbitrary and capricious standard still applies, but application of the standard is shaped by the circumstances of the inherent conflict of interest." Id. (quoting Miller v. Metropolitan Life Insurance Corp., 925 F2d. 979, 984 (6th Cir. 1991). "We look not only at the result - whether it is supported by reason- but at the process by which the result was achieved." Id., 214 F.3d at 393.

An arbitrary and capricious decision is one lacking reason, not supported by substantial evidence, or erroneous as a matter of law. See id., at 392. In ERISA cases, however, the arbitrary and capricious standard can be described as a range, rather than a point. The greater the suspicion of partiality, the more penetrating the review; the smaller the suspicion, the less penetrating the review. Id., at 392-93. In general, the "scope of review is narrow, and 'the court is not free to substitute its own judgment for that of the defendants in determining eligibility for plan benefits.'" Abnathya v. Hoffmann-La Roche,Inc., 2 F.3d 40, 45 (3d Cir. 1993) (quoting Lucash v. Strick Corp., 602 F. Supp. 430, 434 (E.D. Pa. 1984)).

Mazur contends that Hartford's decision to terminate his

terms and provisions of the Policy. (R. 742, Doc. 20, Ex. A at 16).

24

benefits was marked by anomalies, requiring that the court closely scrutinize the termination decision, according it little deference. The court discusses these alleged anomalies seriatim, both to explain why it applies a only slightly heightened standard of review and why it finds that Hartford's decision to terminate Mazur's LTD benefits was not arbitrary and capricious.

## 1. **ALLEGED ANOMALIES IN THE PROCESSING OF MAZUR'S CLAIM**

### a. **Misapplication of the Plan Eligibility Requirement**

Mazur contends that Hartford's decision contravened the language of the Plan because it ignored part of the Plan definition of disability. According to Mazur, the governing Summary Plan Document ("SPD") provides that, in order to qualify as "disabled", a claimant must show that he cannot perform "one or more of the Essential Duties of [his] Occupation, and as a result [his] Current Monthly Earnings are no more than 80% of [his] Indexed Pre-Disability Earnings." (Doc. 20 Ex. A at 16). "After that, you must be so prevented from performing one or more of the Essential Duties of Any Occupation." Id. Mazur argues that Hartford violated the terms of the Plan when it failed to make findings regarding - and did not acknowledge the existence of - the 80% earning requirement. "Instead, Hartford simply found that Mazur was able to perform some light or sedentary work and terminated benefits. The failure to consider and make specific

25

findings regarding whether Mazur's condition allowed him to satisfy the earnings requirement flawed Hartford's decision-making process." (Doc. 30 at 5).

Hartford responds - and Mazur does not dispute - that the SPD cited by Mazur provides that "The Benefits Described Herein are Those in Effect as of January 1, 2003." Mazur became disabled in 2000, and the Plan in effect then did not contain the eighty percent language. In addition, Hartford contends that even if the 2003 SPD described a change in benefits for which Mazur was eligible, the change would not have gone into effect until the "Deferred Effective Date" or the date that Mazur was "Actively at Work for one full day." (Doc. 20 Ex. A at 5-6).

The court does not analyze these document-based arguments further, because it is satisfied that Hartford, whether it was required to do so or not, did take into account Mazur's ability to return to work. On August 22, 2005, Hartford conducted an Employability Analysis Report, relying on Mazur's functional capability as assessed by Dr. Lyon in his August 15, 2005 medical record review. (R. 347). Dr. Lyon wrote: "[T]he evidence leads me to conclude that no specific restrictions or limitations are indicated at this time upon Mr. Mazur's functional capabilities. I feel that it is reasonable to allow him . . . the freedom to adjust positions periodically throughout the day." Id.

In order to determine what jobs Mazur would be capable of

performing, Hartford used an Occupational Access System, "a computerized system that cross references an individual's qualifications profile with 12,741 occupations classified by the U.S. Department of Labor in the 1991 Dictionary of Occupational Titles (DOT)." Id.

According to the analysis, Mazur was capable of returning to his own sedentary occupation, and of performing five other jobs that "were appropriate and commensurate to wage." These included Manager, Benefits($6265/mo.); Personnel Recruiter($3997/mo.); Employment Interviewer($3,977/mo.); Employment Clerk($2676/mo.), and Manager, Employment Agency($5,626/mo.). Pay for all but one of these positions exceeded $3338/mo., which is eighty percent of Mazur's pre-disability wage of $4172/mo. This information was in Hartford's letter terminating benefits and was available to Mazur during the appeal process.(R. 81).

The court does not find any support in the record for Mazur's contention that Hartford misapplied the Plan eligibility requirement.

### b. **Failure to Consider the Impact of Narcotic Drugs**

Mazur contends that Hartford's termination letter fails to explain how Mazur could return to full time employment while taking Hydrocodone and OxyContin which have side effects that impair his ability to function. The court has searched the

27

record, and does not find any evidence that Mazur complained of troubling side effects from medication, or that any doctor suggested that drug side effects were disabling or contributed to his disability. Medication issues were not part of Mazur's original claim for LTD benefits, nor has he ever raised side effects in his submission of information concerning the continuation of benefits. In fact, Mazur reported that he was able to concentrate without difficulty,(R. 187), and the surveillance tape shows that he was capable of driving on four separate days. The burden was on Mazur to establish that narcotics caused or were a significant factor in his disability; he failed to do so. *See* Abnathya, 2 F.3d at 46.

## c. **Evidence Missing from the Administrative Record**

Mazur attempts to cast doubt on the legitimacy of Hartford's decision by focusing on evidence that he contends should have been, but was not part of the administrative record. "Evidence of procedural anomalies include [sic] a report from Dr. Thomas Kramer, an orthopedic specialist who examined Mazur, and one or more MRIs missing from the administrative record." (Doc. 30 at 8). Mazur does not argue that these records were deliberately ignored or excluded from the record. He contends instead that Hartford did not act diligently to find the records in the first place.

28

"Hartford's indifference to trying to obtain [the missing information] . . . is a procedural anomaly that supports heightened scrutiny." (Doc. 30 at 9).

The burden to ensure that the administrative record on appeal is complete lay not with Hartford, but with the claimant. See Pinto, 214 F.3d at 394 n.8(rejecting argument that insurance company had duty to gather more information)(citing Vega v. National Life Insurance Services, Inc., 188 F.3d 287 (5th Cir. 1999)). In Vega, the Court held that a rule placing this burden on the administrator would conflict with the governing standard of review - one which demands that some deference be given to the administrator's decision. The Court of Appeals also wrote:

> Such a rule would also violate basic
> principles of judicial economy. There
> is no justifiable basis for placing
> the burden solely on the administrator
> to generate evidence relevant to
> deciding the claim, which may or may not
> be available to it, or which may be more
> readily available to the claimant. If the
> claimant has relevant information in his
> control, it is not only inappropriate but
> inefficient to require the administrator
> to obtain that information in the absence
> of the claimant's active cooperation.

Id. At 298.

Mazur apparently saw Dr. Kramer almost six months after the original termination decision. Mazur says he assumed that Dr. Kramer's report would become part of the administrative record when he signed a release authorizing Dr. Kramer to send his

report to Dr. Gottron, whose report *was* in the record. (Doc. 30 at 9). Mazur does not state that he arranged for the report to be sent to Hartford or that he made an effort to send the MRIs that he carried to Dr. Kramer's office on to Hartford. Mazur asked Hartford for a copy of his claims file on February 14, 2006. (R. 252). The file was sent to him on February 22, 2006, two days before his appointment with Dr. Kramer. (R. 5). Mazur should have seen that his MRI results were not in the record. That said, he filed his appeal on February 25, 2006, one day after he saw Dr. Kramer, but did not include any notes or a report of this visit. Given the dates, it is difficult to see how Mazur could have thought that Dr. Kramer's report would have been transmitted to Dr. Gottron in time to be included in the record on appeal.

Any lack of vigilance in ensuring that the administrative record was complete appears to be attributable to Mazur.

### d. **Noncompliance with 29 C.F.R. §2560.503-1(g)(iii)**

Mazur again attempts to shift responsibility to Hartford for what he now says are gaps in the administrative record. "[Hartford's] August 30, 2005 [termination] letter does not describe any additional material or information that it needed from Mazur in order to establish his disability or why such material or information is necessary, as required by 20 C.F.R. §

30

2560.503-1(g)[iii]³, leaving Mazur at a loss as to what he needed to provide in order to reinstate benefits." (Doc. 21 at 11-12).

This argument is disingenuous. During the pendency of the appeal process, Mazur was represented by counsel having at least some familiarity with what is required to establish continuing disability. Confusion regarding how to proceed on appeal could have been resolved by legal research or by communication with Hartford. While it is true that Hartford's letter did not identify the precise evidence that would negate its initial termination decision, it was not required to do so.

Hartford clearly explained the basis for its termination decision, made Mazur aware of his right to appeal, provided him with access to his claim file, and told him that he was free to submit additional information bearing on the claim. This notification was, at the very least, in substantial compliance with the governing regulation. Nothing more is required. <u>Ellis v. Metropolitan Life Ins. Co.</u>,126 F.3d 228, 235 (4th Cir. 1997). The Court of Appeals's conclusion with respect to Ellis applies with equal force to Mazur:

> Ellis has somehow conflated these purposes and come to the erroneous belief that MetLife is under an obligation to inform her of what she needs to tell MetLife in order

³This regulation provides that a notification of any adverse benefit determination must include "a description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary."

31

> to obtain disability benefits. That is not
> MetLife's role as a fiduciary. MetLife must
> treat each claimant with procedural fairness,
> but, because it must also guard against
> improper claims, it is not its duty to
> affirmatively aid claimants in proving their
> claims. MetLife's denial letter . . .
> substantially complies with the applicable
> ERISA regulations in all material respects.

### e. **Weight Given to the SAA Disability Finding**

Mazur notes that he continues to receive disability insurance benefits from the Social Security Administration, and contends that Hartford's failure to weigh this in its own disability determination suggests that Hartford's decision was arbitrary and capricious. "[T]here is no evidence that Hartford ever considered the Social Security award, except to recoup an overpayment, and that failure is an additional basis for this [c]ourt to reverse Hartford's decision." (Doc. 30 at 16). Even in cases where the same evidence is integral, a finding of disability for purposes of Social Security does not mandate a finding of disability under an ERISA plan. In contrast to the obligatory, nationwide Social Security program, "[n]othing in ERISA requires employers to establish employee benefit plans, or mandate what kind of benefits employers must provide if they choose to have such a plan." Lockheed Corp. v. Spink, 517 U.S. 882, 887(1996). Instead, employers have discretion to craft their own disability plans. Entitlement to Social Security benefits is determined with reference to a uniform set of federal criteria.

"[T]he validity of a claim to benefits under an ERISA plan," on the other hand, "is likely to turn," in large part, "on the interpretation of terms in the plan at issue." Firestone Tire, 489 U.S. at 115.

The facts of this case render Mazur's disability for purposes of Social Security even less relevant than it might be in a different scenario. Hartford points out that in 2002, when the Social Security benefits decision was made, the evidence available to the Social Security Administration and to Hartford supported the disability determination made by each. By 2005, however, this had changed. The Social Security Administration did not have the benefit of the surveillance video documenting Mazur's activities, nor did it have the benefit of medical opinion generated after the surveillance was conducted.

### f. **Hartford's Reaction Mazur's Rejection of Lump Sum Offers**

According to Mazur, Hartford began looking for ways to terminate Mazur's benefits when he twice failed to accept lump sum settlements. (Doc. 21 at 11). The argument is unreasonable when assessed against the facts. In January 2003, Hartford proposed a settlement which Mazur rejected. Hartford continued to pay Mazur's disability benefits without question or interruption. Hartford's second offer of settlement was made *at Mazur's request* over a year later. Mazur rejected this offer, too. Again,

Hartford continued paying Mazur's disability benefits for more than a year before it made inquiry into whether termination of Mazur's benefits was warranted.

The record with regard to these payments does not support Mazur's contention that the termination of his benefits rested on an anomaly associated with lump sum payments.

### g. The Evidence Supporting Hartford's Termination Decision

Mazur attacks Hartford's analysis of the administrative record as follows:

> "[A]ll Hartford has to support its decision is video surveillance. However, the video . . . merely shows that Mazur . . . may be capable of some activities for brief periods of time. It does not establish that he is able to sustain activity for a sufficient period of time so as to enable him to [return to work]. On this point, all of Mazur's examining physicians and the Social Security Administration agree.

(Doc. 21 at 16). He contends that the objective scientific evidence underlying Hartford's grant of disability benefits - the MRI performed in 2000 (R. 708) - had not been contradicted by other scientific evidence when his benefits were terminated. In the absence of changed objective evidence, the videotapes did not establish that his condition had improved or that he was capable of working on a sustained basis. Mazur also contends that Hartford improperly gave undue weight to the opinions of its own non-examining physicians, and "impermissibly use[d] evidence

that supported the denial of benefits while ignoring or failing
to satisfactorily explain its rejection of evidence supporting an
award." (Doc. 21 at 13).

For reasons detailed below, the court finds that Mazur
mischaracterizes the evidence and Hartford's evaluation of the
record.

## C. **HARTFORD'S DECISION - THE ARBITRARY AND CAPRICIOUS STANDARD**

Having failed to find anomalies which alone or together
suggest self-dealing on the part of Hartford, the court reviews
Hartford's denial under the slightly heightened arbitrary and
capricious standard. Under this standard, a court may not
substitute its own judgment for that of the insurer in reviewing
a benefits decision. It must affirm Hartford's decision if there
was a reasonable basis for the decision, based upon the facts as
known to the administrator at the time the decision was made.
*See* Smathers v. Multi-Tool, Inc., 298 F.3d 191, 194 (3d Cir.
2002).

With that standard in mind, the court turns to the basis for
Mazur's termination. According to Mazur, "his doctors unanimously
opined that he was not able to perform the essential duties of an
occupation on a full time basis . . . ." (Doc. 31 at 11).
Hartford rejected this evidence, "substitut[ing] the opinions of
its investigator for those of a trained doctor or functional
capacity evaluator." Id. Mazur also challenges Hartford's use of

35

independent medical examiners. "Hartford cannot give more weight to Dr. Pick's conclusions and reject the conclusions of Mazur's doctors, or use evidence that supported the denial of benefits while ignoring or failing to satisfactorily explain its rejection of evidence supporting an award." (Doc. 30 at 15).

Mazur alleges that the Hartford ignored the following medical evidence: 1)a myelogram with CT scan performed in January 2001 noting protrusion of disc material at L5-S1 abutting the right S1 nerve root; 2) Dr. Kozakiewicz's March 2001 office note describing "symptomatic right L5-S1 disc protrusion with accompanying right S1 nerve root irritation; 3) Dr. Muccio's observation that an MRI scan showed bulging discs at L4-5 and L5-S1 with signs and symptoms of right S1 radiculopathy; 4) Dr. Gottron's report finding that Mazur suffered severe pain from lumbar degenerative disc disease and neuropathy, and was required to take narcotics; and 5) Dr. Frazetta's diagnosis of segmental dysfunction in the cervical, thoracic, and lumbar spine. (Doc. 30 at 17).

Hartford characterizes the basis for its decision differently. It is undisputed that at the time he was initially awarded benefits, Mazur suffered orthopedic problems serious enough that Dr. Muccio, a neurosurgeon, recommended surgery; it is also undisputed that Mazur's treating physiatrist and chiropractor concluded that he was unable to work. There was,

however, also evidence in the record to support the conclusion that Mazur's condition had improved over time. He chose not to have surgery, and elected to treat only with a chiropractor. Dr Frazetta noted overall improvement. Although Mazur's condition seems to have plateaued at some point, the record does not show that Dr. Frazetta referred him for more aggressive treatment or suggested that he consult an orthopedic specialist. The record also fails to show that Mazur himself sought additional treatment. He last prescribed his most potent medication, OxyContin, in 2004. (R. 185, 227). Based on this information, it was not unreasonable for Hartford to conclude that surveillance was warranted.

Although Mazur discounts the value of the video evidence based on its short length, the segments themselves cover a wider span of time, and are dramatic. This is not, as Mazur contends, the uninformative fifteen minute video described in Dorsey v. Provident Life and Accident Insurance Co., 167 F.Supp. 2d 846 (E.D. Pa. 2001) where the claimant, allegedly suffering from fibromyalgia, was filmed walking slowly across a parking lot and driving her children to school on one occasion. The video in this case is even far more extensive than the "short segments" on which the administrator relied in DeLong v, Aetna Insurance Co., 232 Fed. Appx. 190 (3d Cir. 2007)(supporting Aetna's reliance on twenty-one minute video showing claimant with bulging discs and

other back-related issues driving 100 miles, walking unaided, sitting, moving his arms and legs, bending, negotiating steps, lifting his foot, and swinging his hips from front to back).

Despite Mazur's effort to minimize its significance, the footage in this case is striking. Mazur's ability to carry a propane tank, drive, slam a door with his right leg, run with his dog and bend to play with his pet, climb steps with four bags in his hand, unload full boxes from the top and bottom of a shopping cart, carry two couches with help and a large armchair alone, maneuver each of these pieces of furniture through a door (which he propped open by reaching over his head repeatedly), pump gas, sit on a stool behind the counter of a smoke shop with his legs crossed, and lie down to look under his vehicle were clearly sufficient to call into doubt Mazur's own and his doctors' assessment of his ability to function.

In reaching its decision to terminate Mazur's benefits, Hartford took into account more than the surveillance tapes. It also considered the statements of all of Mazur's doctors including Frazetta and Gottron, who ultimately concluded that Mazur was capable of working, depending to some extent on the type of job. Hartford also considered the reports of independent medical consultants, Drs. Lyon and Pick.[4] Dr. Lyon was of the

---

[4]The Supreme Court has held that "[p]lan administrators are not obliged to accord special deference to the opinions of treating physicians." Black & Decker Disability Plan v. Nord, 538 U.S. 822,

opinion that Mazur could work if given the opportunity to adjust positions frequently. He also devoted a significant part of his report to an analysis of the physical evidence of Mazur's disability, stating that Mazur did not seem to have true lumbar radiculopathy, and that physical findings, although occasionally showing some sensory loss, appeared to be essentially normal. (R. 375).

Hartford also relied on the opinion of a second independent medical consultant, orthopedic surgeon, Dr. Pick, who concluded that the record was devoid of substantive objective findings. He found that Mazur was capable of engaging in light work on a full time basis, and probably had the ability to perform most, if not all, medium level activities.

Even applying a slightly heightened review, the court does not find any ground upon which to conclude that Hartford's decision to terminate Mazur's benefits was arbitrary or capricious. In reaching this conclusion, the court does not ignore Mazur's statements that he has good days and bad days, and that on bad days he may have problems performing sedentary work. It also does not ignore the fact that Mazur has suffered as a

825, (2003). Administrators "may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." Id. at 834. However, "courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." Id.

result of the issues with his back. The arbitrary and capricious standard, however, is a deferential one, and the court is constrained to find that there is substantial evidence in the record to support the termination decision, and that the decision was not based on an error of law.

## D. **THE BREACH OF FIDUCIARY DUTY CLAIMS**

In Count II of the Complaint, Mazur alleges that Hartford, in making its termination decision breached fiduciary duties imposed by ERISA in failing to act for the exclusive benefit of Mazur and in failing to act in accordance with the Plan. Specifically, Mazur contends that Hartford reached its "decision in the absence of all relevant information, and in offering a lump sum settlement that Hartford knew but did not disclose did not reflect a fair value of [Mazur's] claim and which was far below the established reserves for the claim." (Doc. 1 at ¶ 42).

This argument does not merit extended discussion. The court has found that in terminating Mazur's benefits, Hartford both considered the relevant information and acted in accordance with the Plan. The court also finds that Mazur has failed to state a claim for breach of fiduciary duty based on Hartford's failure to disclose the amount of its reserve for Mazur's claim. Mazur has failed to cite any provision of ERISA or applicable regulations mandating such disclosure, or a single case in which a court has

held that such disclosure is required.

Mazur's failure to cite authority is not surprising because its underlying premise is flawed. Mazur assumes that there is a connection between insurance reserves and the actual value of a claim. Case law makes clear that the relationship between claim reserves and the claim's actual value is tenuous. *See* Rhone-Poulenc Rorer Inc. v. Home Indem. Co., Civ. No. 88-9752, 1991 WL 237636 (E.D. Pa. Nov. 7, 1991)(citing Union Carbide Corp. v. Travelers Indemnity Corp., 61 F.R.D. 411 (W.D. Pa. 1973)). The reserve established for a particular claim says little or nothing about the fair value of that claim at any given point, because they are based on actuarial assumptions about wide groups of people rather than on the circumstances of a particular claimant.

Each of the letters containing the lump sum offers suggested to Mazur that he seek professional legal or financial advice in order to assist in deciding whether the settlement might be advantageous.(R. 65,69). There is no record that he did so or that he requested additional information from Hartford.

If the court were to adopt Mazur's position, no LTD benefits administrator could ever settle a claim for less that its reserve value. The court does not find any basis in the law or in the facts of this case upon which to conclude that ERISA mandates this result.

# III. **CONCLUSION**

For the reasons set out above, it is recommended that the Motion for Summary Judgment (Doc. 19) filed by Thomas Mazur be DENIED, and that the Motion for Summary Judgment (Doc. 16) filed by Hartford Life and Accident Insurance Company be GRANTED.

In accordance with the Magistrate's Act, 29 U.S.C. § 636 (b) (1) (B), 636 (b)(1)(b) and (c), and Rule 72.1.4 (B) of the Local Rules for Magistrates, objections to this Report and Recommendation are due by November 26, 2007. Any response is due by December 6, 2007.

November 8, 2007

/S/ Francis X. Caiazza
Francis X. Caiazza
U.S. Magistrate Judge

cc:

Counsel of Record
Via Electronic Mail

42